UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

BRITNEY ABRAHAMS                                                          Docket No.:

                                   Plaintiff,

        -against-                                                          **VERIFIED   COMPLAINT
                                                                          & JURY TRIAL DEMAND**

WORLD WRESTLING ENTERTAINMENT, INC.
CHRIS DUNN, individually
RYAN CALLAHAN, individually
JENIFFER PEPPERMAN, individually
CHRISTINE LUBRANO, individually
MIKE HELLER, individually
VINCE MCMAHON, individually
STEPHANIE MCMAHON, individually
                                                                          Filed on: _____
                                   Defendants.
-------------------------------------------------------------------X


        Plaintiff BRITNEY ABRAHAMS (hereinafter referred to as "Plaintiff" or "Ms.

Abrahams"), by and through her undersigned counsel, THE COCHRAN FIRM, as and for

Plaintiff's Complaint in this action against the Defendants **WORLD WRESTLING**

**ENTERTAINMENT, INC., CHRIS DUNN (individually), RYAN CALLAHAN**

**(individually), JEN PEPPERMAN (individually), CHRISTINE LUBRANO (individually),**

**MIKE HELLER (individually), VINCE MCMAHON (individually), STEPHANIE**

**MCMAHON (individually)** (hereinafter collectively referred to as "**Defendants**") hereby alleges

as follows:

## <u>NATURE OF THE CLAIMS</u>

This is a civil action for declaratory, injunctive, and equitable relief, as well as monetary damages,

to redress Defendants' unlawful employment practices against Plaintiff, including their

discriminatory treatment, harassment, hostile work environment, wrongful termination, and

unlawful retaliation against the Plaintiff due to her race, color, and gender in violation of the Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166) ("Title VII"), 29 U.S.C. § 621 et seq.,42 U.S.C. §1981 ("1981").

Defendants repeatedly subjected Plaintiff to unlawful discrimination and a hostile work environment, as well as unlawful retaliation for complaining of Defendants' unlawful employment practices, including her complaints of racial harassment and discrimination, and other wrongdoing.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 in that the action involves federal questions, because the causes of action asserted herein arise in part under 1981 and Title VII, to remedy violations of the laws of the State of New York based upon Federal Questions and the supplemental jurisdiction of this Court pursuant to *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966) and 28 U.S.C. § 1367, seeking declaratory and injunctive relief and damages to redress the injuries Plaintiff suffered as a result of being discriminated against, and unlawfully terminated by Plaintiff's former employers on the basis of Plaintiff's race, color, and gender.

2.    28 U.S.C. §1331 states that "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

3.    Plaintiff further invokes the supplemental jurisdiction of this Court to adjudicate state and local claims pursuant to 28. U.S.C. 1967. The matter in controversy exceeds, exclusive of interests and costs, the sum of One Hundred Thousand Dollars ("$100,000").

4.    Venue is proper in this District based upon diversity of jurisdiction, and because Plaintiff resides within the Eastern District of New York.

## PROCEDURAL REQUIREMENTS

**5.**     Plaintiff filed a charge with the Equal Employment Opportunity Commission (hereinafter referred to as "EEOC") with respect to the herein charges of discrimination on or about September 6, 2022 (hereinafter referred to as "EEOC Charge No. **520-2022-00167**").

**6.**     On or about March 24, 2023, Plaintiff received a Notice of Right to Sue letter (hereinafter referred to as "Plaintiff's said Notice of Right to Sue letter") from the EEOC for EEOC Charge No. **520-2022-00167**.

**7.**     Plaintiff satisfied all administrative prerequisites and has filed this case within ninety (90) days of receiving the Notice of Right to Sue letter.

## PARTIES

### *The Plaintiff*

**8.**     Plaintiff Britney Abrahams (hereinafter referred to as "Plaintiff" and/or "Ms. Abrahams") is an individual black, African American female who is a resident of the State of New York in Kings County.

**9.**     Plaintiff is therefore a member of multiple protected classes.

**10.**    Plaintiff is a resident of the State of New York, who at all times material met the definition of an "employee" of Defendants **WORLD WRESTLING ENTERTAINMENT, INC.** under all applicable statutes.

**11.**    As a resident of New York City, the unlawful and adverse employment actions of Defendant had a direct impact on New York City.

**12.**    At all times relevant to this Complaint, after April 7, 2022, Plaintiff was and still is, a former employee of Defendants **WORLD WRESTLING ENTERTAINMENT, INC.**

3

### The Defendant Employer

13.    At all times material, Defendant **WORLD WRESTLING ENTERTAINMENT, INC.** (hereinafter referred to as "Defendant **WWE**" and/or "**WWE**" and/or "**the Defendant Employer**") was, and still is, a foreign business corporation, duly organized and existing under and by virtue of the laws of the State of Delaware and authorized to do business in the State of New York.

14.    At all times material, **WWE** met the definition of an "employer," and/or "joint employer," and/or "single employer" under all applicable state and local statutes.

15.    At all times relevant to this Complaint, Plaintiff was an "employee" of **WWE** within the meaning of the aforementioned statutes.

16.    At all times relevant to this Complaint, **WWE** acted by and through their employees, agents, and servants who were acting in the scope and course of employment, agency, and servitude.

### The Individual Defendants

17.    At all times material, **WWE** employed Defendant **CHRIS DUNN** (hereinafter referred to as "Defendant **DUNN**" and/or "**DUNN**") as a **WWE** Senior Writer.

18.    **DUNN** held a supervisory position with **WWE**, controlling many tangible aspects of Plaintiff's job duties, including holding the power to control Plaintiff's work duties, work schedule, and work discipline including termination. **DUNN** is an individual, white, Caucasian male.

19.    **DUNN** was an active participant in the unlawful discrimination, retaliation and otherwise unfair employment decisions and actions taken against Plaintiff.

20.    As Plaintiff's supervisor, **DUNN** has also aided and abetted the unlawful conduct described herein.

21.    At all times material, **WWE** employed Defendant **RYAN CALLAHAN** (hereinafter referred to as "Defendant **CALLAHAN**" and/or "**CALLAHAN**") as the **WWE** Lead Writer.

22.     **CALLAHAN** held, and still holds, a supervisory position with **WWE**, controlling many tangible aspects of Plaintiff's job duties, including holding the power to control Plaintiff's work duties, work schedule, and work discipline including termination. **CALLAHAN** is an individual, white, Caucasian male.

23.     **CALLAHAN** was an active participant in the unlawful discrimination, retaliation and otherwise unfair employment decisions and actions taken against Plaintiff.

24.     As Plaintiff's supervisor, **CALLAHAN** has also aided and abetted the unlawful conduct described herein.

25.     At all times material, **WWE** employed Defendant **JENIFFER PEPPERMAN** (hereinafter referred to as "Defendant **PEPPERMAN**" and/or "**PEPPERMAN**") as a **WWE** Senior writer.

26.     **PEPPERMAN** held, and still holds, a supervisory position with **WWE**, controlling many tangible aspects of Plaintiff's job duties, including holding the power to control Plaintiff's work duties, work schedule, and work discipline including termination. **PEPPERMAN** is an individual, white, Caucasian female.

27.     **PEPPERMAN** was an active participant in the unlawful discrimination, retaliation and otherwise unfair employment decisions and actions taken against Plaintiff.

28.     As Plaintiff's supervisor, **PEPPERMAN** has also aided and abetted the unlawful conduct described herein.

29.     At all times material, **WWE** employed Defendant **CHRISTINE LUBRANO** (hereinafter referred to as "Defendant **LUBRANO**" and/or "**LUBRANO**") as **WWE** Senior Vice President for Creative Writing Relations. **LUBRANO** is an individual white, Caucasian female.

30.     **LUBRANO** held, and still holds, a supervisory position at **WWE,** controlling many tangible aspects of Plaintiff' job duties, including holding the power to control Plaintiff's work, to

discipline Plaintiff, and to hire and fire Plaintiff.

31.     **LUBRANO** was an active participant in the unlawful discrimination, retaliation and otherwise

unfair employment decisions and actions taken against Plaintiff.

32.     As Plaintiff's supervisor, **LUBRANO** has also aided and abetted the unlawful conduct described

herein.

33.     At all times material, **WWE** employed Defendant **MIKE HELLER** (hereinafter referred to as

"Defendant **HELLER**" and/or "**HELLER**") as the **WWE** Lead Writer. **HELLER** is an

individual white, Caucasian male.

34.     **HELLER** held a supervisory position at **WWE** controlling many tangible aspects of Plaintiff'

job duties, including holding the power to control Plaintiff's work, to discipline Plaintiff, and to

hire and fire Plaintiff.

35.     **HELLER** was an active participant in the unlawful discrimination, retaliation and otherwise

unfair employment decisions and actions taken against Plaintiff.

36.     As Plaintiff's supervisor, **HELLER** has also aided and abetted the unlawful conduct described

herein.

37.     At all times material, **WWE** employed Defendant **STEPHANIE MCMAHON** (hereinafter

referred to as "Defendant **MS. MCMAHON**" and/or "**MS. MCMAHON**") as **WWE** Chief

Executive Officer. **MS. MCMAHON** is an individual white, Caucasian female.

38.     **MS. MCMAHON** held, and still holds, a supervisory position at **WWE,** controlling many

tangible aspects of Plaintiff' job duties, including holding the power to control Plaintiff's work,

to discipline Plaintiff, and to hire and fire Plaintiff.

39.     **MS. MCMAHON** was an active participant in the unlawful discrimination, retaliation and

otherwise unfair employment decisions and actions taken against Plaintiff.

6

40.     At all times material, **WWE** employed Defendant **VINCE MCMAHON** (hereinafter referred to as "Defendant **MR. MCMAHON**" and/or "**MR. MCMAHON**") **WWE** Chief Executive Officer. **MR. MCMAHON** is an individual white, Caucasian male **MR. MCMAHON** held, and still holds, a supervisory position at **WWE,** controlling many tangible aspects of Plaintiff' job duties, including holding the power to control Plaintiff's work, to discipline Plaintiff, and to hire and fire Plaintiff.

41.     **MR. MCMAHON** was an active participant in the unlawful discrimination, retaliation and otherwise unfair employment decisions and actions taken against Plaintiff.

42.     Defendants **DUNN, CALLAHAN**, **PEPPERMAN**, **LUBRANO**, **HELLER**, **MS. MCMAHON,** and **MR. MCMAHON** are hereinafter collectively referred to as "**the individual Defendants**."

*The Individual WWE Employees*

43.     At all times material, **WWE** employed Ms. Kyla Sylvers (hereinafter referred to as "Ms. Sylvers") as a writer. Ms. Sylvers is an individual black, African American female.

44.     Ms. Sylvers was a victim of and witness to the unlawful discrimination, retaliation and otherwise unfair employment decisions and actions taken against Plaintiff and other minorities.

45.     At all times material, **WWE** employed Mr. Chad Barbash (hereinafter referred to as "Mr. Barbash") as a writer. Mr. Barbash is an individual white, Caucasian male.

46.     Mr. Barbash was a witness to the unlawful discrimination, retaliation and otherwise unfair employment decisions and actions taken against Plaintiff and other minorities.

47.     At all times material, **WWE** employed Mr. Brian Parise (hereinafter referred to as "Mr. Parise") as a writer. Mr. Parise is an individual white, Caucasian male.

48.     Mr. Parise was a witness to the unlawful discrimination, retaliation and otherwise unfair

employment decisions and actions taken against Plaintiff and other minorities.

49. At all times material, **WWE** employed Ms. Andrea Listenberger (hereinafter referred to as "Ms. Listenberger") as a writer. Ms. Listenberger is an individual white, Caucasian female.

50. Ms. Listenberger was a witness to the unlawful discrimination, retaliation and otherwise unfair employment decisions and actions taken against Plaintiff and other minorities.

## FACTUAL ALLEGATIONS

51. On or about November 3, 2020, **WWE** hired Plaintiff as a temporary employee writer for their weekly flagship WWE SMACKDOWN television series.

52. At all times herein, Plaintiff was an exemplary employee who did not disobey orders or directives from her superiors. Plaintiff performed all duties assigned in a diligent and thorough manner.

53. Throughout her time as a **WWE** writer Plaintiff received numerous compliments for her work performance, including praise from **WWE** executives, Defendant **MR. MCMAHON**, Defendant **MS. MCMAHON**, and Mr. Bruce Prichard (hereinafter referred to as "Mr. Prichard") for her writing.

54. Mr. Prichard even proposed that Plaintiff write all the vignettes for both WWE SMACKDOWN and its sister television series, WWE MONDAY NIGHT RAW as an additional writer position.

55. Plaintiff always got along well with all of her co-workers.

56. By way of example, Plaintiff's Performance Reviews earned Plaintiff increases in salary based on her excellent work. These increases were not guaranteed but rather based on merit.

57. In or around May 2021, Defendants offered Plaintiff permanent employment.

58. Plaintiff asserts that Defendants engaged and continue to engage in a pattern and practice of discrimination against black female employees, African American female employees, and employees who engage in protected conduct on behalf of themselves and other minority employees.

59.   By way of example, within or around Plaintiff's first two (2) weeks of employment with **WWE** she shadowed a male, white, Caucasian writer, Defendant **DUNN**, who wrote a backstage scene for Ms. Bianca Belair (hereinafter referred to as "Ms. Belair"), a black, African American female **WWE** wrestler.

60.   Upon information and belief, Ms. Belair is one of two (2) dark-skinned black, African American female wrestlers.

61.   The said scene included offensively racist and stereotypical jargon which Plaintiff found objectionable.

62.   By way of example, according to the script, **DUNN** intended Ms. Belair, the said black female **WWE** wrestler, to say, "**Uh-Uh! Don't make me take off my earrings and beat your ass!**" which are lines based upon cruel, ugly stereotypes of dark-skinned, black women.

63.   Plaintiff asserts that Ms. Belair uttering that line was, and still is, negatively stereotypical of race and gender, and Plaintiff found it offensive, and still finds it offensive.

64.   Prior to the writing of this scene many of the **WWE** writers commonly complained that they didn't know what to do with Ms. Belair.

65.   As a result, Plaintiff undertook researching Ms. Belair's background, and discovered a fascinating family tree, including an aunt who helped desegregate her high school in the 1960s, and an uncle whose contributions to science were world-renowned.

66.   **DUNN** allowed Plaintiff to write a first draft of Ms. Belair's scene, so Plaintiff included positive references to Ms. Belair's rich family history and sent it to **DUNN** for feedback.

67.   **DUNN** told Plaintiff that the draft "looks great. I'm going to make some edits and submit it to [**CALLAHAN**]."

68.   However, **DUNN** subjected Plaintiff's draft to substantial editing, including inserting the said racial

and gender stereotypes.

69. That same night, Plaintiff complained about the racially offensive and discriminatory nature of the scene to one of her **WWE** superiors, Defendant **CALLAHAN.**

70. Plaintiff emailed **CALLAHAN** and said, "I know I'm new, I'm not trying to be disrespectful or step on [**DUNN**]'s or anyone's toes, but I would be remiss if I didn't mention that [Ms. Belair]'s scene includes racial jargon and offensive stereotypes, particularly her go-home line."

71. Plaintiff also requested clarification for protocol on moving forward with her complaint.

72. In conversation with Ms. Belair the following day, Ms. Belair informed Plaintiff that she told DUNN "**3 DIFFERENT TIMES THAT I DON'T WANT TO SAY THAT LINE! BUT HE NEVER LISTENS TO ME! HE PUTS THAT LINE IN EVERY WEEK**."

73. Ms. Belair said the script's discriminatory line(s) made her look "ghetto."

74. Plaintiff relayed this information to **DUNN** and politely offered to edit the line(s).

75. However, despite Plaintiff's complaint, Defendants failed and/or refused to take any immediate or appropriate corrective action in response.

76. Plaintiff never received any form of response from **CALLAHAN**, verbally nor via email, and **CALLAHAN** never spoke to Plaintiff about her email or the line(s), or the scene.

77. Additionally, **WWE**'s failure and/or refusal to address Plaintiff's complaint emboldened **WWE** employees, including **DUNN** and **CALLAHAN**, to further discriminate against and to retaliate against Plaintiff in response to her protected conduct.

78. By way of example, **WWE** kept the discriminatory line in the script. Plaintiff was scheduled to shadow **DUNN** on two (2) scenes that day, one of which was the said scene with Ms. Belair.

79. However, around halfway through the day, **DUNN** informed Plaintiff that she would now shadow **CALLAHAN**.

80. When Plaintiff requested **DUNN**'s assistance, he told Plaintiff "**YOU HANDLE IT. IT'S YOUR SCENE NOW.**"

81. **CALLAHAN** showed up for the taping of Plaintiff's scenes about 90 seconds before they went live, and he never once mentioned Plaintiff's email.

82. **Defendants** switched Plaintiff's assignment and made her shadow **WWE**'s lead writer, who was not present until the show filmed live.

83. The switch in assignment was due to Plaintiff's race, and gender and had the purpose and effect of sabotaging Plaintiff's career with the **WWE**, and to serve as a pretext for retaliatory adverse actions.

84. **Defendants** did not provide Plaintiff with any training on what needed to be done during the live broadcast.

85. **Defendants'** actions were clearly discriminatory as similarly situated white, male **WWE** employees are not treated in this manner.

86. **Defendants'** actions in this regard were clearly retaliatory, given the temporal proximity between Plaintiff's protected conduct and **WWE**'s adverse employment actions.

87. **Defendants'** actions in this regard were done to humiliate, intimidate and undermine the Plaintiff's performance as she had never been tasked with this responsibility and had no idea of the new role's requirements.

88. Following Plaintiff's complaint, **Defendants** increased the intensity of their discriminatory misconduct, including deliberately subjecting Plaintiff to a number of racist pitches.

89. By way of example, it was discussed in the **WWE** writer's Slack channel before a show, that a new wrestler, Reggie, would dress in drag complete with wig and tights, "so he could partner with Carmella, a female wrestler, in a tag-team match against other female wrestlers."

90. Reggie is a dark-skinned, African American, black straight male wrestler.

91. Given this pitch was shared via the Slack app, Defendants **MR. MCMAHON** and **MS. MACHON**, as well as other **WWE** higher-ups, including Mr. Pritchard, and Mr. Ed Koskey were included on the thread.

92. Plaintiff's co-worker, Ms. Listenberger, responded to the thread, observing that putting a straight black man in drag might perpetuate harmful stereotypes that would offend viewers.

93. **WWE** eventually scrapped the discriminatory pitch, but only in response to a white, Caucasian individual's protected conduct in the form of Ms. Listenberger's complaint.

94. By way of another example, **WWE** forced wrestler Apollo Crews to speak with a Nigerian accent, just because of his Nigerian lineage. Apollo Crews is a black, Nigerian-born male.

95. Plaintiff emailed **CALLAHAN** and complained about the offensive nature of the requirement for Apollo Crews to speak with a stereotypical and exaggerated Nigerian accent.

96. However, despite Plaintiff's complaint, **CALLAHAN** failed and/or refused to take corrective action.

97. As a result, **CALLAHAN** and **WWE** forced Plaintiff to require Apollo Crews to speak with a racially artificial Nigerian accent.

98. By way of another example, in or around the spring of 2021 **CALLAHAN** pitched that a white Caucasian male wrestler with a "hunting" gimmick would hunt a black, male wrestler for fun.

99. In a nutshell, the said hunting gimmick pitch for new wrestlers, Shane Thorne, and Reggie was, "since Shane is Australian, we should make him a crocodile hunter, and instead of crocodiles, he hunts people."

100. Subsequently, a storyline was pitched by **CALLAHAN** where Shane would capture Reggie and constantly beat him up, but Reggie would always escape after being captured.

101.    Holding Reggie captive in cages was also discussed.

102.    Plaintiff found **CALLAHAN**'s pitch highly offensive and objectionable.

103.    Plaintiff again objected to her superior's racially motivated misconduct, specifically stating that a gimmick where a white man hunting a black African American man for sport is racist.

104.    **CALLAHAN** laughed and sarcastically responded, "**OH, WHAT? IS THAT A BAD THING?**"

105.    **CALLAHAN**'s comments and conduct had the purpose and effect of humiliating and intimidating Plaintiff, and dramatically altered her work environment for the worse.

106.    As the **WWE** writing team's sole person of color, Plaintiff was devastated that none of her white, Caucasian co-workers stepped in to complain about this discriminatory and offensive pitch.

107.    Afterwards, Plaintiff spoke with Mr. Parise, a white, Caucasian **WWE** writer, who revealed that he agreed with Plaintiff that the pitch was racist, but he felt too nervous to speak up about it in front of **CALLAHAN**.

108.    However, despite Plaintiff's complaint, Defendants refused to address the complaint and instead continued the discriminatory and retaliatory campaign unabated.

109.    By way of example, on or about April 10 and 11, 2021, **WWE** held its 37th annual WrestleMania event.

110.    WrestleMania is the world's largest professional wrestling promotion consisting of live-streaming and pay-per-view of the event as well as a live audience.

111.    For each of the annual WrestleMania's, **WWE** produces limited-edition items commemorating the specific event.

112.    For WrestleMania 37, **WWE** produced limited edition, WrestleMania 37 branded chairs as it had done in many previous WrestleMania events.

113.    These chairs are movable and meant to be used for temporary seating in the arena where the

WrestleMania event is held.

114.  **WWE** employees who were not African American, and who had not engaged in protected activity were permitted to take these limited-edition event-WrestleMania branded chairs, for their own private use following the WrestleMania event.

115.  In the years prior to Plaintiff making her complaint of discrimination, **WWE** did not subject employees to disciplinary action in response to taking the removable, temporary seating, limited-edition WrestleMania branded chairs, from the WrestleMania events.

116.  **WWE** did not subject these employees to disciplinary action in response to keeping the limited-edition event-specific items, including WrestleMania branded chairs, for their own private use.

117.  In fact, at the end of WrestleMania events held years prior to WrestleMania 37, **WWE** permitted its writing staff to remove limited edition event-specific items from the WrestleMania venues.

118.  Upon information and belief, **WWE** maintained a policy whereby its employees were allowed to remove limited-edition event-specific items, including WrestleMania branded chairs, from the WrestleMania events, and to keep the limited-edition event-specific items for their own private use without fear of reprisal (hereinafter referred to as "**WWE**'s established WrestleMania memorabilia custom and/or policy").

119.  On or about May 2021, as a result of Plaintiff's excellent work performance, Defendants hired her as a permanent employee writer.

120.  At all times herein, Plaintiff was an exemplary employee who did not disobey orders or directives from her superiors. Plaintiff performed all duties assigned in a diligent and thorough manner.

121.  However, Plaintiff asserts that Defendants engaged and continue to engage in a pattern and practice of discrimination against black female employees, African American female employees, and other minority employees.

122.  By way of example, in or around winter 2021, Plaintiff complained to **WWE**'s Human Resources representatives about being racially discriminated against by white, Caucasian senior **WWE** writer, Defendant **PEPPERMAN** during the first few months of her employment.

123.  **PEPPERMAN** discriminatorily treated Plaintiff and other black, and African American **WWE** employees poorly compared to their similarly-situated white, and Caucasian counterparts.

124.  **PEPPERMAN** routinely and unjustifiably raised her voice at Plaintiff, and made rude comments about Plaintiff and other black, and African American **WWE** employees.

125.  **PEPPERMAN** would just snap at Plaintiff and her similarly situated black, African American counterparts, or deliberately berate them in front of everyone else.

126.  **PEPPERMAN** had zero patience for Plaintiff and her similarly situated black, African American counterparts.

127.  **PEPPERMAN**'s tone and countenance routinely differed from when she spoke to or engaged with Plaintiff's white, Caucasian counterparts.

128.  **PEPPERMAN**'s comments and conduct were discriminatory, given she did not treat white, and Caucasian **WWE** employees in this manner.

129.  **PEPPERMAN**'s comments and conduct had the purpose and effect of humiliating and intimidating Plaintiff, and their severity and pervasiveness dramatically altered Plaintiff's work environment for the worse.

130.  However, despite Plaintiff's complaint, **WWE** failed to take any immediate or appropriate corrective action in response.

131.  In or around November 2021, a black female writer's assistant was fired after reporting **WWE** lead writer, **CALLAHAN** for creating a racially hostile environment against African American employees.

132.  Shortly thereafter **WWE** questioned Plaintiff about her experiences with **CALLAHAN**, purportedly pursuant to an investigation into the said black female writer's assistant's protected conduct.

133.  Plaintiff was asked if she "witnessed or was the victim of harassment on the creative writing team."

134.  Plaintiff described the discrimination and hostile work environment she had been subjected to by **PEPPERMAN** and had witnessed by **PEPPERMAN** towards other minority employees.

135.  At a different time, Plaintiff received a call from **WWE** Human Resources representatives. They said, "It was brought to our attention that you called some pitches racist, and I want to know if it was directed at you or a part of direction for a storyline?"

136.  Plaintiff told them it was for a storyline but that it came from **WWE** lead writer **CALLAHAN**, so it really shouldn't have been said once, let alone twice, no matter serious or in jest. Plaintiff told them it was an offensive "joke."

137.  However, **WWE** Human Resources kept repeating, "but was it said about you?"

138.  **WWE** never agreed that it shouldn't have been said at all by someone of authority.

139.  **WWE** also never asked if Plaintiff was okay after hearing those racist and sexist pitches.

140.  In or around November 2021 a **WWE** writer, Mr. Zach Hyatt ("Mr. Hyatt") admitted to Plaintiff and another black, female **WWE** writer, Ms. Sylvers that he was "afraid to critique his group of Black wrestlers."

141.  Plaintiff and Ms. Sylvers spoke to the black performers directly, who expressed feeling "unheard and misunderstood culturally" and who thanked Plaintiff and Ms. Sylvers for their compassionate approach to writing for black, and other minority characters.

142.  Shortly thereafter, Plaintiff and Ms. Sylvers proceeded to share this information with their **WWE** lead writers.

143. Plaintiff asserts that Defendants engaged and continue to engage in a pattern and practice of discrimination against black female employees, African American female employees, and other minority employees.

144. By way of example, in or around late November 2021 racially discriminatory comments were casually made by Plaintiff's white, male Caucasian lead writer **CALLAHAN** about a Muslim wrestler.

145. Ms. Sylvers and Plaintiff, the only black writers on the team, at the time, were tasked to pitch a love storyline between wrestlers Aaliyah, Mansoor, and Angel Garza, who are both Muslim).

146. Ms. Sylvers and Plaintiff pitched that Mansoor has a secret that he's keeping from Aaliyah.

147. **CALLAHAN** disagreed with the secret Ms. Sylvers and Plaintiff wanted for the character.

148. Instead, **CALLAHAN** suggested, "how about his secret is he's behind the 9/11 attacks?"

149. Ms. Sylvers nervously laughed and said, "let's not do that. Let's talk about the other part of the pitch."

150. **CALLAHAN** said, "Oh, I guess you're the lead writer now."

151. Ms. Sylvers again laughed nervously, and said, "for just this moment so we can talk about something else."

152. Following this, whenever a writer asked **CALLAHAN** a question, he would reply, "ask [Ms. Sylvers], she's the lead writer now."

153. **CALLAHAN**'s comments and conduct in this regard were clearly discriminatory given Plaintiff's similarly situated white, Caucasian counterparts were not treated in this manner.

154. Additionally, **HELLER** shared a sexist pitch for a Muslim female wrestler wherein the said female wrestler lacked authority over her own mind and body.

155. Again, Ms. Sylvers and Plaintiff created a love storyline between wrestlers, Aaliyah, Mansoor, and

Angel Garza.

156.    In this pitch, Aaliyah and Mansoor were meant to fall in love, while a jealous Angel tries to break

them up. The pitch made Aaliyah appear intelligent and confident in herself and desires, containing

Aaliyah speaking up for herself against both Angel and Mansoor, and having her love and affection

earned.

157.    Ms. Sylvers and Plaintiff pitched this storyline to **HELLER**, who expressed confusion about

Aaliyah and her choices, particularly her never wanting to be with Angel, who is the obvious villain

in the story. **HELLER** was also confused that Aaliyah wasn't "crying on the stairs after her breakup

with Mansoor."

158.    **HELLER** then counter-pitched that Plaintiff make the storyline a love triangle objectifying and

bimbofying Aaliyah. **HELLER**'s sexist counter-pitch included Angel being forward and

aggressive in his efforts to date Aaliyah, Aaliyah being easily swayed by Angel's evil tactics, and

Aaliyah being confused about which guy she should date, oscillating between the two men until

the end of the storyline.

159.    **HELLER** and **CALLAHAN** made these discriminatory comments while Plaintiff and other

female black, African American employees were in his presence in the writer's room.

160.    **HELLER**'s and **CALLAHAN**'s comments and conduct were clearly discriminatory.

161.    Plaintiff immediately complained about these racially discriminatory comments.

162.    Plaintiff spoke up and asked, "Doesn't that take away Aaliyah's agency?"

163.    Plaintiff told **HELLER** that she wanted to make a pitch that was "more feminist, especially because

Aaliyah's character is already marketed as being 'super-hot.'"

164.    Plaintiff along with a number of her co-workers, including Ms. Sylvers and Mr. Barbash also

complained about the discriminatory nature of their lead writers' comments.

165.    Rather, in response to Plaintiff's protected conduct, Defendants intensified their campaign of retaliatory adverse employment actions.

166.    By way of example, **LUBRANO** met with Plaintiff and Ms. Sylvers and deliberately downplayed **HELLER**'s and **CALLAHAN**'s discriminatory remarks by claiming that she "heard it was a joke. And wacky things are said in the writer's room all the time!"

167.    When Plaintiff indicated that, "it doesn't make it okay," **LUBRANO** responded, "I know but look at the waves we're making in the company. 4 years ago, no woman worked on the writer's team!"

168.    **LUBRANO** followed up and told Plaintiff she was doing a great job and that "[Pritchard], **[MR. MCMAHON]**, and **[MS. MCMAHON]** love [Plaintiff's] writing. But [Plaintiff] should be careful to pick and choose [Plaintiff's] battles."

169.    However, despite Plaintiff's complaints, Defendants refused to take any immediate and/or appropriate corrective action in response.

170.    By way of example, on or about March 29, 2022, in the days leading up to WrestleMania 38, one of Plaintiff's fellow **WWE** writers asked **CALLAHAN** if he and the other writers could each help themselves to a WrestleMania chair at the end of the event.

171.    **PEPPERMAN** informed the writer's room that "**Yeah, but you have to wait till after the show to take it.**"

172.    Another senior **WWE** writer, HYATT said, "**Yeah, you can't take it during the show**."

173.    Yet another senior **WWE** writer, MICHAEL KIRSHENBAUM ("KIRSCHENBAUM") added that people had been allowed to take WrestleMania branded chairs at the previous year's WrestleMania.

174.    **PEPPERMAN** told a story about an employee checking a WrestleMania branded chair at the airport and mentioned that employees can ask **WWE**'s production team to ship the WrestleMania

branded chairs home for them. These stories all evinced **WWE**'s established WrestleMania memorabilia custom and/or policy.

175. At no point did **WWE** lead writers, who were present during this extensive discussion, instruct Plaintiff or her co-workers that they were not entitled to remove limited-edition event specific items, including WrestleMania branded chairs from the venue at the end of WrestleMania 38.

176. On or about April 2 and 3rd 2022 **WWE** held WrestleMania 38.

177. Upon information and belief, on or about April 2, 2022, one (1) Caucasian, male **WWE** writer and one (1) black male **WWE** writer removed WrestleMania branded chairs after the event.

178. One of the Caucasian, male writers took the WrestleMania branded chair to the writers' room, in plain sight of Defendant **LUBRANO**, the **WWE** lead writers, **WWE** Vice President, Mr. Ed Koskey, and **WWE** Senior Vice President, Mr. Prichard.

179. It is clear that **WWE**'s actions were discriminatory, given Defendants did not reprimand either writer for taking the WrestleMania 38 branded chairs.

180. Upon information and belief, Defendants had several opportunities that evening to reprimand the employees for having taken WrestleMania branded chairs, and/or to prevent employees from taking WrestleMania branded chairs.

181. However, at no point did Defendants reprimand the male **WWE** writers for removing the WrestleMania 38 branded chairs.

182. In addition, another Caucasian **WWE** writer assistant, Mr. Lucas Goldman ("Mr. Goldman") left the writer's room to try and take a WrestleMania 38 branded chair.

183. **CALLAHAN** and Mr. Koskey were informed that Mr. Goldman left the room to retrieve a WrestleMania 38 branded chair.

184. When Mr. Goldman returned to the writers' room without a WrestleMania 38 branded chair,

**CALLAHAN** and Mr. Koskey playfully teased him saying, "**Better luck next time. Guess you have to settle for a paycheck.**"

185. Further at the end of the night, **WWE** Vice President and Senior Vice President left the venue with Plaintiff and her team, including those male employees who were in possession of WrestleMania 38 branded chairs from the evening's event.

186. However, Defendants did not reprimand the Caucasian male **WWE** writers for taking the WrestleMania branded chairs.

187. Further, **WWE** lead writers witnessed one of Plaintiff's white, male, Caucasian co-workers load the WrestleMania branded chair into a car.

188. **CALLAHAN** proceeded to enter the vehicle containing the WrestleMania 38 branded chair.

189. Despite numerous opportunities to do so, Defendants did not reprimand or otherwise discipline any of the male, white, Caucasian **WWE** writers about taking WrestleMania 38 branded chairs after the event.

190. On or about April 3, 2022, at the end of the event, Plaintiff, and a co-worker each took a WrestleMania 38 branded chair, showed their badges to security, and were allowed backstage while carrying the WrestleMania branded chairs.

191. Plaintiff and her male, Caucasian co-worker took the WrestleMania 38 branded chairs to the writers' room, where **WWE** lead writers and Vice President and Senior Vice President were present.

192. Plaintiff placed her WrestleMania branded chair directly next to **HELLER** and openly discussed having taken the WrestleMania 38 branded chair.

193. In or around the early hours of next morning, Plaintiff's supervisor emailed the writing team instructing people to return the WrestleMania 38 branded chairs and demanding why they thought

taking the WrestleMania branded chairs was a "wise choice."

194.   On or about April 7, 2022, in retaliation for engaging in protected conduct Defendants unlawfully and pretextually terminated Plaintiff's employment.

195.   Likewise, **WWE** had a custom and/or policy of allowing employees to take WrestleMania branded movable chairs from the annual events without repercussion.

196.   Once Plaintiff made her complaints of discrimination, she was targeted for a pretextual termination by WWE's executive management team and her direct supervisors.

197.   **WWE**'s executive management team[1] consists of six (6) individuals, none of whom is a black or African American woman. They were **MR. MCMAHON**, Nick Khan, **MS. MCMAHON**, Paul Levesque, Frank A. Riddick III, and Kevin Dunn:



198.   Plaintiff asserts that Defendants engaged, and continue to engage, in a pattern and practice of discrimination against black female employees, African American female employees, other black employees.

199.   It is clear that despite Plaintiff's excellent work performance, Defendants actually terminated her employment based on her complaints about Defendants' racial discrimination and due to her race

---

[1] World Wrestling Entertainment, Inc., "Who We Are", available at https://corporate.wwe.com/who-we-are/leadership, accessed July 1, 2022

and gender.

200.    While Plaintiff's employment with **WWE** was a harrowing, traumatic experience, the events complained of herein do not reflect a unique incident, as rudimentary internet research paints a similarly[2] distressing[3] picture of discriminatory[4] abuse[5] and misconduct[6] by **WWE** and those occupying the most powerful positions[7] within **WWE**.[8]

201.    The totality of these acts demonstrates a pattern of discrimination intentionally perpetrated by the **WWE** management and executive officers against Plaintiff.

202.    For a considerable period following her termination Plaintiff was unable to locate permanent work due to Defendants' discrimination and defamatory statements regarding her work performance.

203.    Upon information and belief, Defendants devised, implemented, and executed a scheme through which they gave disparate, preferential treatment and superior benefits to male and white, Caucasian employees, while knowingly and intentionally denying equal treatment and benefits to female and black, African American employees, including Plaintiff.

204.    Defendants discriminated against and terminated Plaintiff on the basis of her race, color, gender and because Plaintiff complained about and/or opposed the unlawful conduct of Defendants related to the above protected classes.

---

[2] Dion Beary, 'Pro Wrestling Is Fake, but Its Race Problem Isn't' available at https://www.theatlantic.com/entertainment/archive/2014/07/the-not-so-fictional-bias-in-the-wwe-world-championship/374042/, accessed July 1, 2022

[3] Mark Lugris, 'Tom Cole, Who Accused WWF Of Sexual Abuse and Harassment, Has Committed Suicide Cole had accused Director of Wrestling Operations Terry Garvin of sexually harassing him' available at https://www.thesportster.com/news/tom-cole-who-accused-wwf-of-sexual- abuse-and-harassment-has-committed-suicide/, accessed July 1, 2022

[4] Bob Hohler, 'Former WWE diva joins lawsuit, alleges sexual abuse, brain injuries' available at https://www.bostonglobe.com/sports/2016/11/12/former-wwe-diva-joins-lawsuit-alleges-sexual-abuse-brain-injuries/DxKRDb8reXsjH5ACJZExKN/story.html, accessed July 1, 2022

[5] City News Service, 'WWE: The Most Racist Organization?', available at https://bleacherreport.com/articles/88205-wwe-the-most-racist-organisation, accessed July 1, 2022

[6] Travis Clark, '30 years after WWE's first female referee accused Vince McMahon of raping her, an ex-wrestler has claimed it's true' https://www.businessinsider.com/vince-mcmahon-rape-allegation-wwe-referee-backed-up-by-wrestler-2022-6, accessed May 20, 2022

[7] Bloomberg, '*WWE probes $3M payment from Vince McMahon to former female employee, report says*' https://www.thestar.com/business/2022/06/16/wwe-probes-3m-payment-from-vince-mcmahon-to-former-female-employee-report-says.html, accessed July 1, 2022

[8] Staff Reporter, 'WWE boss Vince McMahon's affairs nightmare continues as another accuser steps forward', available at https://www.iol.co.za/sport/wwe-boss-vince-mcmahons-affairs-nightmare-continues-as-another-accuser-steps-forward-5ba5e3ae-66a1-45a4-8798-447e6bfcdef6, accessed July 1, 2022

205.    Defendants retaliated against Plaintiff for engaging in protected activity.

206.    The above are just some examples of Defendants' unlawful discrimination and retaliation of Plaintiff.

207.    As a result of Defendants' unlawful and discriminatory actions, Plaintiff  has endured unlawful humiliation resulting in extreme emotional distress, severe depression, extreme anxiety, economic harm, and physical ailments.

208.    As a result of Defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

209.    As a result of Defendants' unlawful and discriminatory actions, Plaintiff has endured financial hardships and irreparable damage to her professional reputation.

210.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits, and other compensation, which such employment entails. Plaintiff has also suffered pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

211.    Plaintiff further claims aggravation, activation, and/or exacerbation of any preexisting condition.

212.    As Defendants' actions were malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands punitive damages against Defendants, jointly and severally.

213.    Plaintiff claims unlawful constructive and/or unlawful actual discharge and also seeks reinstatement.

214.    Plaintiff claims alternatively (in the event Defendants claim so or that the Court determines) that Plaintiff is an Independent Contractor, and Plaintiff  makes all applicable claims for the above conduct and facts under the applicable law pertaining to Independent Contractors.

215.    Plaintiff claims a continuous practice of discrimination and makes all claims herein under the

continuing violations doctrine.

**AS A FIRST CAUSE OF ACTION**
**FOR RACE AND COLOR DISCRIMINATION**
**IN VIOLATION OF TITLE VII**
**(AGAINST ALL DEFENDANTS)**

216. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

217. Title VII states in relevant part as follows:

(a) Employer practices: It shall be an unlawful employment practice for an employer:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's **race**, **color**, religion, sex, or national origin.

218. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e *et seq.*, as amended, for relief based upon the unlawful employment practices of the above-named **WWE.** Plaintiff complains of **WWE**'s violations of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's race and color.

219. **WWE** engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e *et seq.*, by subjecting Plaintiff to discrimination on the basis of Plaintiff's race, and color.

220. **WWE** engaged in unlawful employment practices prohibited by 42 U.S.C. 2000e *et seq.*, by harassing and otherwise discriminating against Plaintiff as set forth herein.

221. **WWE** violated the above and Plaintiff suffered numerous damages as a result.

**AS A SECOND CAUSE OF ACTION**
**FOR RETALIATION**
**IN VIOLATION OF TITLE VII**
**(AGAINST ALL DEFENDANTS)**

222.   Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

223.   Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e-3(a) provides that it shall be unlawful employment practice for an employer: "(1) to . . . discriminate against any of his employees . . . because she has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

224.   Defendants **WWE** engaged in unlawful employment practices prohibited by 42 U.S.C. 2000e *et seq.* by discriminating against Plaintiff with respect to the terms, conditions, or privileges of employment because of Plaintiff's opposition to the unlawful employment practices of Defendants.

225.   **WWE** violated the above and Plaintiff suffered numerous damages as a result.

**AS A THIRD CAUSE OF ACTION**
**FOR DISCRIMINATION**
**IN VIOLATION OF 42 U.S.C. §1981**
**(AGAINST ALL DEFENDANTS)**

226.   Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

227.   **WWE**'s conduct, by and through their agents, in treating the Plaintiff in a manner unequal to other employees, discriminatorily denied Plaintiff equal treatment on the basis of her race in violation of 42 U.S.C. § 1981 in the terms, conditions and privileges of her employment.

228.   **WWE** in failing to adequately investigate and remedy the treatment to which Plaintiff was subjected, despite the Defendants' knowledge of the conduct, discriminatorily denied Plaintiffs equal treatment on the basis of race in violation of 42 U.S.C. § 1981 in the terms, conditions, and

privileges of their employment. The discrimination Plaintiff experienced was sufficiently severe and/or pervasive so as to adversely alter her working conditions and cause her emotional distress.

229. The discriminatory acts of the Defendants as described above were intentional and were substantially motivated on the basis of Plaintiff's race. Defendants engaged in an ongoing and continuous pattern and practice of intentional discrimination against the Plaintiff up until her unlawful termination.

230. Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of 42 U.S.C. § 1981.

231. Defendants violated the above and Plaintiff suffered numerous damages as a result.

**AS A FOURTH CAUSE OF ACTION**
**FOR RACE, COLOR, and GENDER, DISCRIMINATION**
**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**
**(AGAINST ALL DEFENDANTS)**

232. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

233. The Administrative Code of the Code of City of NY § 8-107 [1] provides that "It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, **race**, creed, **color**, national origin, **gender**, disability, marital status, sexual orientation or alienate or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

234. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1)(a) by discriminating against the Plaintiff as set forth herein.

**235.**   Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of New York City Administrative Code Title 8.

**236.**   Defendants violated the above and Plaintiff suffered numerous damages as a result.

**AS A FIFTH CAUSE OF ACTION**
<u>**FOR RETALIATION**</u>
<u>**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**</u>
<u>**(AGAINST ALL DEFENDANTS)**</u>

**237.**   Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

**238.**   The New York City Administrative Code Title 8, §8-107(1) (e) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discharge . . . or otherwise discriminate against any person because such person has opposed any practices forbidden under this chapter. . ."

**239.**   Each of the Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Tide 8, §8-107(1) (e) by discriminating against the Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Plaintiff's employer.

**240.**   Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of New York State City Administrative Code Title 8.

**241.**   Defendants violated the above and Plaintiff suffered numerous damages as a result.

**AS A SIXTH CAUSE OF ACTION**
<u>**FOR HOSTILE WORK ENVIRONMENT**</u>
<u>**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**</u>
<u>**(AGAINST DEFENDANTS WWE & PEPPERMAN)**</u>

**242.**   Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint.

243. A hostile work environment is one that is sufficiently severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive.

244. Plaintiff was subjected to a sufficiently severe and pervasive work environment where she was subjected to abusive comments related to race and color. Defendants' mistreatment only escalated when Plaintiff filed an internal discrimination complaint.

245. As a direct and proximate result of Defendants' improper hostile and abusive work environment, Plaintiff sustained serious and severe personal injuries which are permanent and continuing in nature, and has been caused to suffer severe mental anguish, and emotional instability in an amount to be determined at trial.

**AS A SEVENTH CAUSE OF ACTION**
**FOR DEFAMATION**
**IN VIOLATION OF THE COMMON LAW**
**(AGAINST DEFENDANTS WWE)**

246. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs of this Complaint with the same force and effect as if fully set forth herein.

247. Each of the aforementioned false, defamatory statements is about and concerns Plaintiff.

248. Each of the aforementioned false, defamatory statements was published to a broad audience.

249. Each of the aforementioned false, defamatory statements is false.

250. Defendants knew each of the aforementioned false, defamatory statements was false at the time they made them, and/or they acted with reckless disregard as to their truth or falsity, and/or at a minimum, negligently.

251. Defendants deliberately published each of the aforementioned false, defamatory statements knowing they would be disseminated to a broad audience and would harm Plaintiff's reputation and good standing.

252. Defendants acted with spite and malice when making each of the aforementioned false, defamatory statements.

253. Defendants intended that each of the aforementioned false, defamatory statements would inflict harm on the Plaintiff and, indeed, did inflict serious harm, including but not limited to severe emotional distress.

254. Defendants are liable to Plaintiff for the common law tort of defamation.

255. As the tortious actions of the Defendants were callous, reckless, willful without justification and in total disregard of Plaintiff's rights, Plaintiff is entitled to punitive and compensatory damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the State of New York, and the City of New York;

B. An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C. An award of damages in an amount to be determined at trial, but in any event in excess of the jurisdictional limit of any other court which might otherwise have jurisdiction over this matter, plus prejudgment interest, to compensate Plaintiffs for all monetary and/or economic damages, including but not limited to, the loss of past and future income, wages, compensation, seniority, and other benefits of employment;

D. An award of damages in an amount to be determined at trial, but in any event in excess of the jurisdictional limit of any other court which might otherwise have jurisdiction over this matter, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for their severe mental anguish and emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, emotional pain and suffering and other physical and mental injuries;

E. An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiffs in an amount to be determined at trial, but in any event in excess of the jurisdictional limit of any other court which might otherwise have jurisdiction over this matter, plus prejudgment interest;

**F.** An award of punitive damages, in an amount to be determined at trial, but in any event in excess of the jurisdictional limit of any other court which might otherwise have jurisdiction over this matter;

**G.** An award of costs that Plaintiffs have incurred in this action, as well as Plaintiffs reasonable attorneys' fees to the fullest extent permitted by law; and

**H.** Such other and further relief as the Court may deem just and proper.


    Dated: New York, New
      York April 24, 2023


                         Respectfully submitted,
                         THE COCHRAN FIRM


                         _____

                         DEREK S. SELLS
                         Counsel for Plaintiff
                         One Exchange Plaza
                         55 Broadway, 23rd Floor
                         New York, New York 10279
                         (Tel No.)  (212) 553-9215
                         (Facsimile) (212) 227-8763